**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

MUSCOGEE CREEK INDIAN FREEDMEN BAND, INC.,
P.O. Box 6366
Moore, OK 73153,

RHONDA K. GRAYSON,
6020 S.E. 83rd Pl.,
Oklahoma City, OK 73135,

SHARON LENZY-SCOTT,
9250 Nichols Rd.,
Oklahoma City, OK 73120,

JEFFREY D. KENNEDY,
2505 S.E. 12th St,,
Moore, OK 73160,

N.K., a minor, through her Parent and Next Friend, ALISHA KENNEDY,
2505 S.E. 12th St,,
Moore, OK 73160, and

JOHNNIE MAE AUSTIN,
713 E. 34th Street North,
Tulsa, OK 74106,

        Plaintiffs

    v.

RYAN ZINKE, Secretary of the United States Department of the Interior,

UNITED STATES DEPARTMENT OF THE INTERIOR, and

JAMES FLOYD, Principal Chief of the Muscogee (Creek) Nation, in His Official Capacity,

        Defendants.

Case No.: 18-cv-01705

**COMPLAINT**

Johnnie Mae Austin, Rhonda K. Grayson, Sharon Lenzy-Scott, Jeffrey D. Kennedy, N.K., and the Muscogee Creek Indian Freedmen Band, Inc. (hereinafter collectively referred to as "Plaintiffs"), by and through their undersigned counsel, and for their complaint against Ryan Zinke, Secretary of the United States Department of the Interior and the United States Department of the Interior (collectively referred to as the "Federal Defendants"), and James Floyd, Principal Chief of the Muscogee (Creek) Nation (hereinafter referred to as "Chief Floyd") (collectively "Defendants"), allege as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiffs are individuals and a collection of persons whose direct lineal ancestors were listed on the final Dawes Rolls of 1906 as Creek Nation Freedmen ("Creek Freedmen" or "Freedmen") and citizens of the Muscogee Creek Nation ("MCN" or "Creek Nation").  Plaintiffs include descendants of (1) individuals who were enslaved by MCN, (2) Creeks of "African Descent," (3) free "Africans" living as citizens of the Creek Nation, and/or (4) "mixed blood" Creek Nation citizens who were listed as Creek Freedmen on the Dawes Rolls (collectively "Descendants" or "Creek Freedmen Descendants").  Pursuant to Article 2 of the Creek Treaty of 1866 between the United States and the MCN, the Freedmen and Freedmen Descendants, regardless of their "blood" status "shall have and enjoy all the rights and privileges of native citizens" of the MCN.  Creek Treaty of 1866, Art. 2, June 14, 1866, 14 Stat. 785, 1866 WL 18777 (hereinafter "Treaty of 1866").

2.      Despite this ironclad legal relationship, made possible only by the MCN's exercise of its sovereignty, the MCN and its federal benefactors have perpetuated race-based discrimination and the badges of slavery by using the Freedmen Descendants' African ancestry to deny them the rights and benefits of MCN citizenship.  The Federal Defendants and the MCN have excluded Creek Freedmen and their Descendants from the rights guaranteed by the Treaty of 1866, including but not limited to the right of citizenship, right to vote, right to hold office, and right to be recognized

2

for who they are: MCN citizens by birthright, heritage, history, and culture.  The Creek Freedmen Descendants therefore bring this civil suit for declaratory and injunctive relief under the Constitution and laws of the United States to re-secure those rights and privileges, which the Defendants have wrongly denied.

## PARTIES

3.     Plaintiff Muscogee Creek Indian Freedmen Band ("MCIFB") is a 501(c)(3) non-profit organization comprised of and operated by descendants of Creek citizens designated as Creek Freedmen by the Dawes Commission.[1]  MCIFB currently has members representing more than 700 individual Creek Freedmen families.  MCIFB membership is restricted to only those individuals who can prove that they are direct lineal descendants of individuals enrolled on the Creek Nation Freedmen Roll pursuant to the Burke Act of 1906.  The mission of MCIFB is to preserve the unique history and heritage of the Muscogee Creek Indians known as Creek Freedmen; to promote interest and participation by sharing genealogical information with members, researchers, and the general public; to serve as an educational resource to researchers through lectures, workshops, conferences, and museum exhibits; and to educate the public regarding Creek Freedmen and to fight for the reinstatement of the Creek Freedmen's political and legal rights as citizens of the Creek Nation, as defined by the Treaty of 1866.  The Board of MCIFB has authorized the filing and prosecution of this action.

4.     Plaintiff Rhonda K. Grayson ("Grayson") is a direct lineal descendant of America Cohee-Webster, Dawes Roll #4661, who was enrolled on the Dawes Rolls as a Creek Freedman.

---

[1] The Dawes Commission was created by Congress to "negotiate" agreements with Oklahoma's Five Tribes to end tribal land ownership and open up Indian Territory to white settlement and eventual statehood for Oklahoma.

Grayson, a board member of MCIFB, is Creek by lineage and is eligible for enrollment as a citizen of the MCN pursuant to the Treaty of 1866, but has been denied enrollment.

5.      Plaintiff Sharon Lenzy-Scott ("Lenzy-Scott") is a direct lineal descendant of Jackson Perryman, Dawes Roll #3635, who was enrolled on the Dawes Rolls as a Creek Freedman. Lenzy-Scott, a board member of MCIFB, is Creek by lineage and is eligible for enrollment as a full citizen of the MCN pursuant to the Treaty of 1866, but has been denied enrollment.

6.      Plaintiff Jeffrey D. Kennedy ("Kennedy") is a direct lineal descendant of Ben Grayson, Dawes Roll #5329, who was enrolled on the Dawes Rolls as a Creek Freedman.  Kennedy, a board member of MCIFB, is Creek by lineage and is eligible for enrollment as a citizen of the MCN pursuant to the Treaty of 1866, but has been denied enrollment.

7.      Plaintiff N.K. ("N.K."), a minor, is a direct lineal descendant of Mary Walker, Dawes Roll # 2068, who was enrolled on the Dawes Rolls as a Creek Freedman.  N.K. is Creek by lineage and is eligible for enrollment as a citizen of the MCN pursuant to the Treaty of 1866.

8.      Plaintiff Johnnie Mae Austin ("Austin") is a direct lineal descendant of John W. Simmons, Dawes Roll #645 who was enrolled on the Dawes Rolls as a Creek Freedman, and is the great-great granddaughter of MCN Chief (Micco) Cow Tom.[2]  Austin grew up speaking Creek, attending Creek Nation functions, and fully participating in programs and benefits only available to MCN citizens, such as per capita payments pursuant to the Act of September 21, 1968, 82 Stat. 855.  Austin is Creek by lineage and is eligible for enrollment as a citizen of the MCN pursuant to the Treaty of 1866, but has been denied enrollment.

---

[2] A wealthy and well-known Creek of African descent, Cow Tom, was one of five MCN citizens who negotiated and signed the Treaty of 1866 on behalf of MCN.

4

9. Defendant Ryan Zinke is the Secretary of the Department of the Interior ("Secretary Zinke" or the "Secretary") and the principal government official responsible for the administration of tribal affairs and the operations of the Bureau of Indian Affairs ("BIA"), a bureau within the United States Department of Interior ("DOI").  Secretary Zinke is an officer of the United States.

10. Defendant DOI is an agency of the United States government.  The DOI includes the BIA and is responsible for the operations of the BIA.

11. James Floyd is the Principal Chief of the MCN and the principal government official responsible for the enforcement of the MCN Constitution and protection of all citizens of the MCN. Article V, Section 1 of the MCN Constitution vests all executive power of the MCN in the Principal Chief.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331. This Court has jurisdiction to review agency action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702–703.  Plaintiffs seek declaratory relief pursuant to 28 U.S.C. §§ 2201–02.  Plaintiffs seek equitable relief pursuant to 28 U.S.C. § 1343.

13. This action arises under the Constitution and laws of the United States, including but not limited to the Fifth and Thirteenth Amendments to the Constitution of the United States; the Treaty of 1866 between the United States and the Creek Nation, 14 Stat. 785; Pub. L. No. 91-495, 84 Stat. 1091 ("Act of 1970"); the Oklahoma Indian Welfare Act of 1936, 25 U.S.C. §5203 ("OIWA"); and the APA, 5 U.S.C. §§ 701, *et seq.*

14. Personal jurisdiction over the Federal Defendants is proper because the Federal Defendants reside in, and can be served in, this district.

15. This Court has personal jurisdiction over Principal Chief Floyd pursuant to D.C. Code § 13-423 because he transacted and continues to transact business in the District of Columbia

and/or has caused tortious injury in the District of Columbia by an act or omission outside the District of Columbia, while regularly doing and/or soliciting business in the District of Columbia.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because the Federal Defendants reside in this district.

17.     The Federal Defendants have waived sovereign immunity to Plaintiffs' claims in this Complaint through the APA and the United States' fiduciary and trustee obligations to the MCN and its rightful citizens.   Secretary Zinke has acted beyond his authority by allowing subordinate officials to violate the Constitution and laws of the United States, as Plaintiffs allege in this Complaint.   Secretary Zinke therefore has no sovereign immunity under the doctrines established by *Ex Parte Young*, 209 U.S. 123 (1908), *Larsen v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682 (1949), and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

18.     Principal Chief Floyd has acted beyond the scope of his authority by violating, or allowing subordinate officials to violate, the Constitution and laws of the United States, and the Treaty of 1866, as Plaintiffs allege in this Complaint.   Principal Chief Floyd therefore has no sovereign immunity under the doctrines established by *Ex Parte Young*, 209 U.S. 123 (1908), *Fletcher v. United States*, 116 F.3d 1315 (10th Cir. 1997), and *Vann v. United States Department of Interior*, 701 F.3d. 927 (D.C. Cir. 2012).

## ALLEGATIONS COMMON TO ALL COUNTS

### History of Muscogee Creek Nation and the Creek Freedman

19.     For more than three centuries, the MCN included people of different "races," skin color, and national origins among its citizens.   Only recently has the MCN, with the Federal Defendants' assistance and indifference, perpetrated a policy of exclusion based upon race.

20.     Historically, the Creek Nation comprised a confederacy of separate towns, tribes, and peoples throughout what is now the southeastern United States.[3]

21.     As colonists and eventually non-indigenous Americans began to inhabit this area, these new residents sought to "civilize the Creek Indian."  In the ensuing decades, the United States continuously and repeatedly attempted to impose, often by force, its customs, economy, religion, and political structure on indigenous groups such as the MCN.

22.     One American custom adopted by some Creek citizens was the plantation economy and the reliance on chattel African slavery as a labor force.

23.     Along with enslaved Africans who were owned by MCN citizens, there were also MCN citizens of African descent and free Blacks openly living as citizens of the MCN.

24.     All of these segments of MCN society were forcibly removed pursuant to the Indian Removal Act of 1830, when the United States expelled the MCN from their traditional homelands and sent them along the infamous Trail of Tears to live in Indian Territory, in what is now Oklahoma.

25.     The Federal Government removed the Creeks primarily by their traditional tribal "town," and it was the town "Miccos" or chiefs who kept the tribal rolls.  This allowed the MCN citizens who made it to Oklahoma to reestablish their towns.

26.     Removal was carried out by the U.S. military, and approximately 24,000 MCN citizens were forced to travel to Indian Territory by foot or riverboats.  Due to poor planning,

---

[3] Among those peoples were the Yamassee or Jamassi who were reported to have been "immigrants from Africa prior to the European discovery of America." See, *United States Department of Interior Census Office, Extra Census Bulletin, Washington, D.C.: United States Census Printing Office (1894),* p. 27.

organization, and indifference by the federal government, thousands of MCN citizens died on the way to Indian Territory due to exposure, starvation, and disease.

27.     Even after removal to Indian Territory, some MCN citizens continued to hold slaves until the Creek Treaty of 1866 abolished slavery in the Creek Nation.

## The Civil War and the Treaty of 1866

28.     In 1861, Union forces withdrew from Indian Territory and Confederate officials formally occupied Indian Territory.

29.     Some Creeks, known as the "Lower/Southern Creeks," who had been more willing to adopt the plantation economy and other European customs, provided supplies, men, and support to the Confederacy, and even sent representatives to the Confederate Congress.

30.      Other Creeks, known as the "Upper/Loyal Creeks," who generally resisted cultural assimilation, provided supplies, men, and support for the Union.  A contingent of Loyal Creeks, which included a substantial "Black" Creek component, left their homes in Oklahoma and moved to Kansas to flee Lower/Southern Creek soldiers and their Confederate allies.

31.     The Battle of Honey Springs Creek was a major battle that occurred in Indian Territory during the Civil War, and Upper/Loyal Creeks, including "Black" Creeks, valiantly fought against the Confederacy and their allies.

32.     In 1865, as the Civil War ended, President Andrew Johnson designated a commission to travel to Fort Smith, Arkansas to convene a council for the purpose of negotiating new treaties with the Creek and the other four tribes making up the so-called "Five Civilized Tribes": the Seminoles, Cherokees, Choctaws, and Chickasaws.

33.     The members of that commission declared that a treaty with the United States "must" contain certain stipulations, including that "[t]he institution of slavery, which has existed among

several of the tribes, must be forthwith abolished, and measures taken for the unconditional emancipation of all persons held in bondage, and for their incorporation into the tribes on an equal footing with the original members, or suitably provided for."  Report of D.N. Cooley, *Southern Superintendence* 296, 298. (Oct. 30, 1865).

34.    In an exercise of its sovereignty, the MCN negotiated and executed the Treaty of 1866 with the United States.

35.    That Treaty of 1866 became the foundational legal document of the Creek Nation and established the modern MCN as it is known today.

36.    The Treaty of 1866 provides in pertinent part:

> [I]nasmuch as there are among the Creek many persons of African descent…it is stipulated that hereafter these persons, lawfully residing in said Creek country, under their laws and usages, or who have been thus residing in said country, and may return within one year from the ratification of this treaty, and their descendants and such others of the same race as may be permitted by the laws of said Nation to settle within the limits of the jurisdiction of the Creek Nation as citizens [thereof], shall have and enjoy all the rights and privileges of native citizens, including an equal interest in the soil and national funds; and the laws of said Nation shall be equally binding upon and give equal protection to all such persons . . . .

Treaty of 1866, Art. 2.

37.    Functionally identical clauses are in the treaties the Seminole, Cherokee, and Choctaw also executed with the United States in 1866.

## MCN Post-Civil War and Pre-Dawes Rolls Enrollment

38.    Shortly after executing the Treaty of 1866, the MCN reorganized their government constitutional structure and in 1867, the MCN created a new and expansive constitution ("1867 Constitution").

39.    The 1867 Constitution did not discriminate against Creeks of African descent, Free Black, or Creek Freedmen citizens of MCN.

40.     Between 1867 and 1895, the MCN created numerous rolls of its citizens. None of these rolls created by the MCN contained or listed blood quantum, or singled out Creeks of African descent, "Free Black" MCN Citizens, or former enslaved Africans who were emancipated and accepted as Creek citizens pursuant to the Treaty of 1866.

41.     Between 1866 and 1906, Creeks of African descent were an essential part of the MCN community, as evidenced by their service in important and high positions in MCN government, and other areas of MCN life including Creek citizens like Sugar George, Judge Henry Reed, Harry Island, and Warrior Rentie.

**The Dawes Rolls**

42.     In 1887, Congress passed the Dawes Act of 1887 ("Dawes Act").

43.     The stated purpose of the Dawes Act was to prepare Indian Territory for statehood and white settlement.  To this end, the Dawes Act authorized the transfer of most of the land owned corporately by the so-called Five Civilized Tribes (the Creek, Cherokee, Seminole, Chickasaw, and Choctaw nations) to individual tribal citizens.  Implicit in this allocation policy was an effort to eliminate the tribes' ability to self-govern and to destroy the communal way of life practiced by MCN.

44.     After the passage of the Dawes Act, Congress created the Dawes Commission in 1893.  Congress tasked the Dawes Commission with identifying all MCN citizens eligible for land allotment in what would come to be known as the Dawes Rolls.

45.     Congress then passed the Curtis Act of June 28, 1898, 30 Stat. 495, ("Curtis Act"), directing the Dawes Commission to create two lists of citizens of the Creek Nation who would be eligible for land allotment: (1) the "Creek Nation Creek Roll," which was purportedly only composed of Creek citizens with Creek blood; and (2) the "Creek Nation Freedmen Roll," which

was purportedly only a roll of those citizens of the Creek Nation who were formerly enslaved Africans and devoid of any Creek blood.[4]

46.     The Dawes Commission, motivated by racism, used race and MCN citizens' physical appearance to segregate Creeks of African Descent, i.e. "Creek Freedmen."  The "true" Creeks, in the Dawes Commission's estimation, were listed on the Creek Roll, also known as the Blood Roll; the Creek Freedmen (*i.e.* individuals of African descent, regardless of whether they or their ancestors were previously enslaved in the MCN) were listed on the Creek Freedmen Roll.

47.     The Dawes Commission employed the hypo-descent rule, by which any individual with "one drop" of "Black blood" was to be considered Black and therefore belonged on the Freedmen Roll.

48.     The Dawes Commission therefore enrolled many Creeks of African descent on the Freedmen Roll, regardless of whether they or their ancestors were ever enslaved in the MCN or how much "Creek blood" they actually possessed.[5]

49.     Therefore, once the Dawes Rolls closed on March 4, 1907, Creek citizens enrolled on the Freedmen Roll and their descendants, in perpetuity, would always carry the ugly badge of slavery, regardless of whether the enrollees or their ancestors were ever enslaved.

**Expulsion of Creek Freedmen and Divesture of Citizenship Rights**

50.     On or about August 18, 1975, the MCN through its National Council, submitted to DOI a draft constitution ("Draft Constitution") that, among other things, contained express

---

[4] *See* Felix S. Cohen, *Handbook of Federal Indian Law*, 431 (1982).

[5] "[I]n cases of mixed freedmen and Indian parents, which was common among the Creeks . . . the applicant was always enrolled as a 'freedmen'."  Kent Carter, *The Dawes Commission and the Allotment of the Five Civilized Tribes 1893–1914* (1999).  In fact, Dawes Commission personnel were instructed to look for and/or inquire if an MCN citizen had any African ancestry, and to place that individual on the so-called Freedmen roll.  *Id.*

provisions which (1) stripped individuals on the 1906 Creek Freedmen Rolls and their then-living lineal descendants of their MCN citizenship; and (2) prevented the unborn lineal descendants of individuals who were enrolled on the 1906 Creek Freedmen Rolls from becoming citizens of MCN.

51.     Before the MCN submitted the Draft Constitution to DOI, the MCN did not seek, obtain, or allow any input from Creek Freedmen or individuals representing Creek Freedmen interests.

52.     On or about September 26, 1975, DOI responded to MCN's Draft Constitution. DOI, despite offering feedback and suggested revisions to various parts of the Draft Constitution, raised no objections to the proposed expulsion of Creek Freedmen or Creek Freedmen Descendants from the MCN.

53.     On October 29, 1977, then-MCN Principal Chief Claud Cox, a proponent of the new constitution, admitted that one of the express goals of the Draft Constitution was to strip Freedmen and Creek Freedmen Descendants of their MCN citizenship and rights stating:

> When you go back to the old [1867] Constitution, you are licked before you start; because it doesn't talk about Indians, it talks about CITIZENS of the CREEK NATION. When you got down to the Allotment time, there were more that was non-Indians or half-blood or less, who outnumbered the full blood, all of these totaled about 11,000, and there were only 18,000 on the entire Roll; so there was only 9,000 above One-half blood. That's the reason, they lost control; the FULLBLOOD lost control. That's what we're fighting, this blood quantum, trying to get back and let the people control because under the old Constitution, you've lost before you ever started. There were three FREEDMAN bands that would outnumber you today as citizens. So if we want to keep the INDIAN in control we've got to take a good look at this thing and get us a Constitution that will keep the Creek Indian in Control.

MCN National Council Minutes, October 29, 1977 at 31.

54.     On August 17, 1979, DOI approved for MCN referendum the new MCN constitution ("1979 Constitution").

55.     On October 6, 1979, the MCN held an election to formally adopt the 1979 Constitution and replace the 1867 Constitution.

56.     Section 503 of the OIWA, 25 U.S.C. § 5203, in effect in 1979, required the participation of at least 30% of "those entitled" to vote, or the results of the election would be invalid.

57.     Upon information and belief, the total number of "entitled voters" that MCN officials identified prior to the 1979 constitutional referendum did not include Creek Freedmen or Creek Freedmen Descendants in an apparent effort to meet OIWA election requirements.  Creek Freedmen and their descendants were denied the right to vote on the 1979 Constitution and did not cast votes.

58.     Upon the dubious ratification of the 1979 Constitution, and with DOI's approval, the MCN illegally declared that all Freedmen were not entitled to MCN citizenship and would no longer be recognized or allowed to be citizens of MCN.  The MCN also began to summarily deny Creek Freedmen and their Descendants applications for citizenship.

59.     As a result, thousands of Creek citizens—including Plaintiffs, whose ancestors' names appeared on the Creek Freedmen Roll—were stripped of their legal rights and cultural identity.  Creek Freedmen Descendants have been denied their MCN citizenship rights, as the MCN has implemented statutes and policies under the illegal 1979 Constitution and in violation of the Treaty of 1866.

60.     The Federal Defendants have done nothing to prevent or rectify the Creek Freedmen Descendants' expulsion from the MCN in violation of the plain language of the Treaty of 1866 guaranteeing Creek Freedmen and their descendants' citizenship in the MCN.

61.     Between 1979 to the present, eligible Freedmen and Creek Freedmen Descendants applied for MCN citizenships and were summarily denied.  Oftentimes Freedmen applicants would be informed of their denial via a form letter from the Citizenship Board, which would include some version of the following language taken from a May 31, 2002 letter from MCN to a Creek Freedmen applicant:

> We are returning your letter and any other documents submitted for enrollment into the Muscogee (Creek) Nation because in checking the Dawes Commission Rolls, your ancestors were enrolled on the Creek Freedmen Rolls. If you will note from the copy you submitted there is no blood quantum listed because they are not Creek by Blood. When slavery was abolished following the Civil War, Treaties were negotiated with the Five-Civilized Tribes; the Choctaw, Cherokee, Chickasaw, Creek and Seminole Nations. The treaties conferred citizenship in the tribes on the negroes who had been held in slavery by the tribes. Such citizens were referred to as 'Freedmen.'[6]

### Freedmen Litigation in MCN Tribal Court

62.     Beginning in 2004, two Freedmen Descendants, Fred Johnson "(Johnson")" and Ron Graham ("Graham"), litigated the issue of Freedmen and Freedmen Descendants citizenship within the MCN court in *Johnson and Graham v. Muscogee (Creek) Nation of Oklahoma Citizenship Board*, CV 2003-54.

63.     The MCN Citizenship Board ("Citizenship Board"), which was created after ratification of the unlawful 1979 Constitution, repeatedly denied Johnson's and Graham's citizenship applications between 1983 and 2003.

64.     Johnson and Graham appealed the Citizenship Board's administrative decisions to the MCN District Court, alleging arbitrary and capricious decision making and abuses of discretion by the Citizenship Board.

---

[6] *See* letter dated May 31, 2002, from MCN to Creek Freedmen Applicant on file with undersigned counsel.

65.     Johnson and Graham contended that they and all Freedmen were eligible for citizenship in MCN pursuant to the Treaty of 1866, the Muscogee (Creek) Nation Constitution, and the MCN Citizenship Code.

66.     A bench trial on the merits was held over seven days between August 28, 2005, and September 14, 2005.

67.     In its March 27, 2006, opinion, the MCN District Court declined to reach the substantive issues directly related to the Treaty of 1866 and the validity of the 1979 Constitution. Instead, the MCN District Court found the Citizenship Board did not follow MCN law that mandated that the Citizenship Board process the citizenship applications of Johnson, Graham, and other Descendants to have their citizenship applications processed.

68.     On or about April 13, 2006, the Citizenship Board refused to comply with the MCN District Court order to process Johnson's and Graham's citizenship applications.  On November 2, 2007, the MCN Supreme Court unanimously reversed the MCN District Court decision and refused to rule on the applicability of the citizenship provisions of the Treaty of 1866.

69.     It is clear from the history of the Johnson and Graham litigation that further litigation in MCN courts is futile and that the Freedmen have exhausted their tribal remedies.

### Federal Defendants' Ongoing Violation of the Treaty of 1866

70.     The Treaty of 1866 is a bilateral agreement, binding both the MCN and the Federal Defendants to its terms.  Nevertheless, the Federal Defendants continue to violate that agreement by allowing the MCN to keep Creek Freedmen Descendants from taking their rightful place among the MCN citizenry.  The Federal Defendants have failed, and continue to fail, to take any action to protect and/or reinstate Creek Freedmen Descendants' citizenship rights in the MCN.

71.     The United States violated the Treaty of 1866 when DOI approved the 1979 Constitution, despite the MCN's clear intention to use the document to exclude Creek Freedmen and their Descendants, which was contrary to the explicit terms of the Treaty of 1866.

72.     The Federal Defendants have continued to recognize the MCN in a government-to-government relationship, even though the MCN continues to select its leaders in elections from which Creek Freedmen Descendants are barred.   Creek Freedmen and Creek Freedmen Descendants have been barred from participating, as voters and candidates, in every MCN election since 1979 through the present.   For example, Chief Floyd was elected in November 2015 without the legal participation of Creek Freedmen Descendent voters.   And yet the Federal Defendants continue to recognize the Floyd administration.

73.     Federal Defendants have an obligation to protect the Creek Freedmen Descendants and refuse recognition of the MCN government until such time as MCN Chief Floyd affirms and restores Creek Freedmen Descendants' citizenship rights.   According to DOI precedent, the "BIA has the authority and the responsibility to decline to recognize the results of a tribal election when it finds that violation of the [Indian Civil Rights Act] has tainted the election results."   *United Keetoowah Band of Creek Indians in Oklahoma v. Muskogee Area Director*, 22 IBIA 75, 83 (1992). By continuing to recognize the MCN and its government, elected and formed under the illegal 1979 Constitution, the DOI has violated and continues to violate its own precedent and policy, and has breached and continues to breach its responsibility to the Freedmen Descendants pursuant to Article 2 of the Treaty of 1866.

74.     Upon information and belief, the MCN has received and continues to receive federal funding distributed by the DOI for the benefit of individual MCN citizens.   Upon information and belief, the Federal Defendants have knowledge that Principal Chief Floyd distributes funds under

these federal programs in a discriminatory manner by excluding Creek Freedmen Descendants, including Plaintiffs, from participation in and receipt of the benefits of the programs by virtue of their status as Freedmen Descendants.

75.     Plaintiffs have no adequate remedy at law.

**The Treaty of 1866 is Binding on Both the MCN and the Federal Defendants**

76.     The Treaty of 1866 is a bilateral agreement negotiated and signed by two sovereign entities utilizing their executive and legislative governmental powers.  The validity of the agreement has not been contested by the MCN or the Federal Defendants.  The Treaty of 1866 is the supreme law of the land regarding the citizenship rights of Creek Freedmen Descendants.

77.     The U.S. Supreme Court has established that there must be "clear and plain evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other and chose to resolve that conflict by abrogating the treaty."  *United States v. Dion*, 476 U.S. 734, 739-40 (1986).

78.     Restrictions on Indian Treaty abrogation are well-settled in U.S. Supreme Court precedent.  Treaty rights are too fundamental to be casually cast aside: "Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so."  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999) (citations omitted).

79.     There has been no act of Congress expressing any intent to abrogate Article 2 of the Treaty of 1866.

80.     The MCN cannot unilaterally extinguish the Freedmen's rights under the Treaty of 1866.  The MCN exercised its sovereignty to execute and bind itself to the terms of the Treaty of 1866, and the MCN cannot now, under the guise of sovereignty, claim the power to renege on its covenant to admit the Freedmen and their descendants as citizens of the MCN.

81.     DOI has at least twice taken the position that treaty provisions functionally identical to Article 2 of the Treaty of 1866 guarantee Freedmen Descendants citizenship in other similarly situation Five Tribes—specifically the Seminole and the Cherokee—but has failed or refused to do with regard to MCN.

82.     This Court has already analyzed a treaty provision functionally identical to Article 2 of the Treaty of 1866, and found that it guaranteed Cherokee citizenship in the Cherokee Nation of Oklahoma.  *See Cherokee Nation v. Nash*, 267 F.Supp.3d 86 (D.D.C. 2017).

**FIRST CAUSE OF ACTION**
**Claim Against all Defendants**
**Violation of the U.S. Constitution and Federal Law**

83.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–82 as if fully set forth herein.

84.     The Federal Defendants have breached the Treaty of 1866 and their duty to protect the citizenship rights of the Plaintiffs, including without limitation their voting right, their right to run for and hold office, and their right to equal access to all benefits arising from citizenship in the MCN.

85.     The United States has and will continue to disburse millions of dollars in federal funds to Principal Chief Floyd's government, despite the MCN's breach of the Treaty of 1866.

86.     Principal Chief Floyd oversees and approves the continuing disenfranchisement of and denial of citizenship rights and benefits to the Creek Freedmen Descendants.

87.     Defendants' acts violate, without limitation, the United States Constitution, the Act of 1970, the OIWA, the Treaty of 1866, and the Indian Civil Rights Act.

88.     The Defendants have violated and continue to violate the Fifth and Thirteenth Amendments to the U.S. Constitution by perpetuating the badges of slavery and treating Plaintiffs

18

differently from other citizens of the MCN, and/or denying Plaintiffs' their right to citizenship in the MCN because of their classification as the descendants of former slaves and as other individuals of African descent.

89.     By reason of the foregoing, a ripe and justiciable controversy exists, and Plaintiffs have standing to assert their rights.  Plaintiffs are entitled to declaratory and injunctive relief to assert and preserve their rights as citizens of the Muscogee (Creek) Nation.

**SECOND CAUSE OF ACTION**
**Claim Against Federal Defendants**
**Judicial Review of Agency Action Under the APA**

90.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–89 as if fully set forth herein.

91.     The Federal Defendants are responsible for protecting the interests of the MCN and its citizens, including the interests of the Creek Freedmen Descendants.

92.     By recognizing James Floyd as Principal Chief of the MCN, as well as other officials elected to office in illegal MCN elections, the Federal Defendants have approved the racially discriminatory and unlawful disenfranchisement of the Creek Freedmen Descendants.

93.     DOI precedent dictates that the "BIA has the authority and the responsibility to decline to recognize the results of a tribal election when it finds that violation of the [Indian Civil Rights Act] has tainted the election results." *United Keetoowah Bank of Creek Indians in Oklahoma v. Muskogee Area Director*, 22 IBIA 75, 83 (1992).  By failing to follow this precedent and other case law (e.g. *Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1 (D.D.C. Sept. 27, 2001) and *Seminole Nation v. Norton*, 223 F. Supp. 2d 122 (D.D.C. 2002)), the Federal Defendants have discriminated against the Creek Freedmen to their injury and prejudice.

94.     Plaintiffs require and request a declaration, pursuant to 28 U.S.C. § 2201 that, pursuant to 5 U.S.C. § 701, et. seq., the complained-of actions and inactions of the Federal Defendants are arbitrary, capricious, an abuse of discretion, and not in accordance with law.

### THIRD CAUSE OF ACTION
### Claim Against Federal Defendants
### Equal Protection

95.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1–94 as if set forth fully herein.

96.     The denial of entitlement benefits deriving from the funds distributed by the Federal Defendants to the MCN is a denial of equal protection of the laws, and thus deprives the Creek Freedmen Descendants of due process of law in violation of the Fifth Amendment of the U.S. Constitution.  There is no lawful reason for the denial of benefits deriving from the funds distributed by the United States to the MCN.

97.     As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment that Creek Freedmen Descendants are entitled to receive benefits deriving from the funds distributed by the United States to the MCN on the same basis as other citizens of the MCN.

98.     As a further result of the foregoing, Plaintiffs are entitled to an injunction compelling the Federal Defendants to disapprove or withhold disbursements of federal funds or funds derived from MCN trust assets to the MCN, unless those disbursements benefit the Creek Freedmen Descendants on the same terms as the benefit offered to all other citizens of the MCN; and further, to condition any further release or payment of monies from federal funds or funds derived from MCN trust assets on the MCN's compliance with that directive.

## FOURTH CAUSE OF ACTION
### Claim Against Principal Chief Floyd
### Violation of the U.S. Constitution and Federal Law

99.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–98 as if set forth fully herein.

100.    Pursuant to *Ex Parte Young*, a federal court can enjoin tribal officers from acting unconstitutionally, either because their action violates the U.S. Constitution directly or because the tribal official's actions are contrary to federal law, which is the supreme law of the land.

101.    Principal Chief Floyd—who willfully and purposefully implements and/or enforces policies denying Creek Freedmen Descendants, including Plaintiffs, the right to enroll as citizens of the MCN—violates the Plaintiffs' rights and privileges that are guaranteed to them pursuant to the Treaty of 1866, OIWA 25 U.S.C. § 5203, and the Indian Civil Rights Act 25 U.S.C. §§ 1302, *et seq*.[7]

102.    Defendant MCN Chief Floyd's actions are ongoing and represent a gross deprivation of the Constitutional and Treaty of 1866 rights of Creek Freedmen Descendants', including Plaintiffs', constitutional, statutory, and treaty rights.

103.    By reason of the foregoing, a ripe and justiciable controversy exists, and the Plaintiffs have standing to assert their rights.

---

[7] The purpose of Indian Civil Rights Act is to impose upon Native American tribal governments restrictions applicable to federal and state governments as well as to protect individual rights of Indians, while fostering tribal self-government and cultural identity. *See* Indian Civil Rights Act of 1968, 25 U.S.C.A. §§ 1302–1303; *see also*, *Wounded Head v. Tribal Council of Oglala Sioux Tribe of Pine Ridge Reservation*, 507 F.2d 1079 (8th Cir. 1975).

## PRAYER FOR RELIEF

Plaintiffs respectfully pray this Court will grant declaratory and injunctive as follows:

a.  Declaring that:

    i.  The Creek Freedmen Descendants are Creek citizens;

    ii.  The Treaty of 1866 guarantees the Creek Freedmen Descendants the right to full and equal citizenship in the MCN;

    iii.  The Creek Freedmen Descendants are legally indistinguishable from other citizens of the MCN pursuant to the Treaty of 1866; and

    iv.  As equal citizens of the MCN, the Creek Freedmen Descendants are entitled to all rights privileges, protections, and benefits arising from citizenship in the Creek Nation equally and on the same basis as all other MCN citizens, including, without limitation, the right to vote in MCN elections, the right to run for and hold MCN office, and the right to receive funds and benefits available to MCN citizens.

b.  Declaring that no federal statute or superseding treaty has modified the Creek Freedmen Descendants' citizenship rights as granted in the Creek Treaty of 1866.

c.  Declaring that no amendment to the MCN Constitution has modified or can modify the citizenship rights of Creek Freedmen Descendants because those rights are derived from the Treaty of 1866 and not the MCN Constitution.

d.  Declaring that Principal Chief Floyd's and MCN's actions depriving Creek Freedmen of their full MCN citizenship rights, including without limitation the right to vote in MCN elections, run for and hold MCN office, and receive funds

and benefits on the same basis as all other MCN citizens, violate the Treaty of 1866.

e.   Declaring the MCN 1979 Constitution void.

f.   Declaring the designation or description "Creek Freedmen" a badge of slavery.

g.   Enjoining Principal Chief Floyd, in his official capacity, from implementing or permitting any law, policy, practice, decision, statute, resolution, action, or policy, express or implied, that directly or indirectly:

   i.   Denies, impair, or burdens the citizenship rights of the Creek Freedmen Descendants;

   ii.   Prohibits, burdens, or prevents Creek Freedmen Descendants from enrolling in the MCN;

   iii.   Prohibits, burdens, or prevents Creek Freedmen Descendants from voting in future elections;

   iv.   Prohibits or prevents Creek Freedmen Descendants from running for or holding MCN office;

   v.   Prohibits or prevents the evaluation of Creek Freedmen Descendants' citizenship applications in accordance with the Thirteenth Amendment to the U.S. Constitution and the Treaty of 1866;

   vi.   Denies Creek Freedmen Descendants the right to access federal funds distributed to the MCN for the benefit of all MCN citizens; or

   vii.   Operates to disenfranchise or otherwise diminish, or burden the exercise of the MCN citizenship rights of the Creek Freedmen Descendants.

h.   Declaring that:

      i.   The Federal Defendants have a duty to protect the MCN citizenship rights of the Creek Freedmen Descendants; and

      ii.   The United States, in its capacity as fiduciary and trustee, may not approve any act, law, policy, decision, practice, or commission by the MCN, its elected officials, its courts, or agents that denies, burdens, or diminishes the rights of its Creek Freedmen Descendant citizens.

i.   Directing the BIA to appoint a trustee to ensure that the civil rights of the Creek Freedmen are not violated in the future.

j.   Enjoining Federal Defendants from approving disbursements from funds distributed by the United States to the MCN, unless those disbursements benefit in the same manner, and to the same extent, the Creek Freedmen Descendants on the same terms as they benefit all other citizens of the MCN.

k.   Enjoining Federal Defendants from recognizing or benefiting any MCN government, or any action of the MCN government, until the MCN government is constituted with the full and fair participation of Creek Freedman on a basis equal to that of all other MCN citizens under a constitution ratified in an election open to Creek Freedmen in compliance with the Treaty of 1866, the U.S. Constitution, the Indian Civil Rights Act, Oklahoma Indian Welfare Act, 25 U.S.C. § 5203, the Fifth Amendment, the Thirteenth Amendment, and the Act of 1970.

l.   Awarding attorneys' fees, disbursements, and costs pursuant to 42 U.S.C. § 1988(b) and any other applicable provisions of law.

m.   Providing any and all further relief this Court deems just and equitable.

Dated: July 20, 2018

Respectfully submitted,

*/s/ Nessa H. Coppinger*

John S. Guttmann, D.C. Bar No. 251934
(Attorney of Record)
Nessa H. Coppinger, D.C. Bar No. 477467
(Attorney of Record)
Graham C. Zorn, D.C. Bar No. 981974
(application pending)
Matthew D. Schneider, D.C. Bar No. 198043
(application pending)
BEVERIDGE & DIAMOND PC
1350 I Street NW, Suite 700
Washington, DC 20005
Phone: (202)789-6000 Fax: (202)789-6190
jguttmann@bdlaw.com
ncoppinger@bdlaw.com
gzorn@bdlaw.com
mschneider@bdlaw.com

ATTORNEYS FOR PLAINTIFFS

Damario Solomon-Simmons, OBA No. 20340
M. David Riggs, OBA No. 7583
Donald M. Bingham, OBA No. 794
Kristopher E. Koepsel, OBA No. 19147
RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS
502 West 6th Street
Tulsa, Oklahoma 74119
(918) 587-3161 - Phone
(918) 587-9708 – Facsimile
dsimmons@riggsabney.com

Melvin C. Hall, OBA No. 3728
RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS
528 NW 12th Street
Oklahoma City, Oklahoma 73103
(405) 843-9909 - Phone
(405) 842-2913 - Facsimile
mhall@riggsabney.com

ATTORNEYS FOR PLAINTIFFS (TO BE
ADMITTED *Pro Hac Vice*)